THE CHICAGO GAS LIGHT AND COKE COMPANY

*v.*

THE PEOPLE'S GAS LIGHT AND COKE COMPANY.

*Filed at Ottawa September 26, 1887.*

1. CORPORATIONS—*of their powers, generally.* The powers of corporations created by statute are such only as the statute confers, and they are confined to the exercise of such powers as are expressly granted, and such incidental ones as are necessary to carry into effect those specifically conferred.

2. CONTRACTS *in partial restraint of trade—as to corporations owing a duty to the public.* The general rule that contracts in partial restraint of trade are not invalid, does not apply to corporations engaged in a public business in which the public are interested. Such corporations can not be allowed, by contract, to disable themselves, even partially, in the discharge of duties of a public nature, the performance of which is beneficial to the public. Any private contract by them which is injurious or prejudicial to the public interests, is void, on the ground of public policy.

3. GAS COMPANIES—*public nature of their franchise—power to abandon their duties to the public, by contract.* The manufacture and distribution of illuminating gas, by means of pipes or conduits placed, under legislative authority, in the streets of a town or city, is a business of a public character. It is the exercise of a franchise belonging to the State. The services rendered and to be rendered for such grant are of a public nature. Such right is conferred by legislative grant, as well for the benefit of the public as of the corporation taking the same.

4. A private corporation to which is granted by its charter the privilege of manufacturing and supplying a city and its inhabitants with gas for illuminating purposes, can not, by contract with another company, disable itself from the performance of its duty to the public, and transfer, absolutely, its right to furnish gas to any part of the city, and a court of equity will not enforce such a contract, it being contrary to public policy.

5. Where a corporation having a franchise for the manufacture and supply of illuminating gas for a city and its inhabitants, and owing a duty to the public, actually enters upon its business and the discharge of its duties, a court of equity will not enforce the specific performance of a contract by which it agrees to abandon the discharge of its duties to the public, and not thereafter to engage in its business, in a certain portion of the city.

6. Power in a gas company "to borrow money and to mortgage or lease any of its property or franchises," does not carry with it, by implication, the authority to assign and transfer any of its privileges and business. So

where a gas company was invested with the power to manufacture and sup-
ply gas to a city and its inhabitants, and to borrow money and to mortgage
or lease its property, it was *held*, that it had no power to sell and assign the
exclusive privilege of making and selling gas in a certain part of the city.

7. SAME—*the particular case.* In 1849 a gas company was chartered,
with the exclusive privilege of supplying a city and its inhabitants with
gas for the period of ten years. In 1855 another gas company was formed
under a special charter empowering it to manufacture and sell gas in the
same city, after the expiration of the exclusive privilege given to the prior
company, thus giving the business to two competing companies. Each
company erected the necessary works in the city for the manufacture and
supply of gas, when the two companies entered into a contract, whereby
the old company exchanged its mains and pipes in a part of the city, to the
new company, for its mains and pipes in the other part of the city, and
each agreed with the other to have the exclusive right of supplying gas in
its part of the city for one hundred years, neither to interfere with the busi-
ness of the other in its territory: *Held*, that by the grant of the second
charter, the legislature intended to do away with the monopoly, and afford
competition in the business, and that the contract was void, as tending to
create or continue a monopoly, and as against public policy.

APPEAL from the Appellate Court for the First District;—
heard in that court on appeal from the Superior Court of Cook
county; the Hon. HENRY M. SHEPARD, Judge, presiding.

Mr. JOHN N. JEWETT, for the appellant:

The subject matter of the contract must be within the scope
of the powers of the contracting parties. The transfer of its
privileges by the old company was not authorized by its charter.

The contract must not contravene any rule of public policy.
The object of the legislature in chartering the two companies
was to prevent a monopoly and create competition,—not to
create two monopolies instead of one. Contracts tending to the
creation of monopolies are void, unless expressly authorized.

An agreement by a telephone company to receive and trans-
mit telegraph messages for one telegraph company only, is void.
*State* v. *Telephone Co.* 36 Ohio St. 296.

Contracts to maintain prices and prevent competition in
prices, are held to be void in the following cases:—Common
carriers: *Sayre* v. *Benevolent Association*, 1 Duv. (Ky.) 143.

Owners of boats for passengers and freight: *Hooker* v. *Van-derwater*, 4 Denio, 349; *Stanton* v. *Allen*, 5 id. 434.  Insurance companies:   Greenwood on Public Policy, 655.

Such a contract as this is against the policy of the State in granting the charters, opposed to public interest and beyond the powers of the corporations.   *Railway Co.* v. *Railway Co.* 7 Eng. L. and Eq. 505; *McGregor* v. *Official Manager*, 16 id. 180; *Mayer* v. *Railway Co.* 30 id. 120; *Tracy* v. *Talmadge*, 14 N. Y. 163; *Talmadge* v. *Tell*, 3 Seld. 328.

The privileges granted by the State for the public convenience and benefit can not be abandoned or relinquished to another by contract, except it be a contract authorized by the State granting the privileges.   *State* v. *Railroad Co.* 29 Conn. 538; *Thomas* v. *Railroad Co.* 101 U. S. 71; *Beman* v. *Rufford*, 6 Eng. L. and Eq. 106; *Railway Co.* v. *Railway Co.* 21 id. 319; *Railway Co.* v. *Railway Co.* 12 id. 224; *Winch* v. *Railway Co.* 13 id. 506; *Railway Co.* v. *Railway Co.* 19 id. 515; *Johnson* v. *Railway Co.* 19 id. 585.

Contracts are void, if covenants in restraint of trade, as against public policy, enter into and form a part of them; and both parties are at fault in respect to such covenants. *Bank* v. *King*, 44 N. Y. 87; *Craft* v. *McConoughy*, 79 Ill. 346.

There can be no doubt that the parties in this case are *in pari delicto*.  The illegal covenants are mutual covenants, and the common motive and purpose of them was to create and foster a monopoly.  Such covenants are as much against public policy as covenants in restraint of trade.   *Arnot* v. *Canal Co.* 68 N. Y. 558; *Coal Co.* v. *Coal Co.* 68 Pa. St. 173; *Railroad Co.* v. *Mathers*, 71 Ill. 592; 104 id. 257.

Mr. MELVILLE W. FULLER, also for the appellant:

The supplying of illuminating gas is a business of a public nature, to meet a public necessity.   *Gas Co.* v. *Light Co.* 115 U. S. 650; *Gas Co.* v. *Gas Co.* id. 692; *Shepard* v. *Gas Co.* 6 Wis. 539.

Combinations among those engaged in business impressed with a public character, or which, though not public, has become a necessary adjunct to commerce, to control their rates to the public, are void. Thus, combinations between common carriers, to destroy competition, were held void. *Sayre* v. *Benevolent Association*, 1 Duv. (Ky ) 143 ; *Hooker* v. *Vanderwater*, 4 Denio, 349 ; *Stanton* v. *Allen*, 5 id. 434.

So a combination between insurance companies to stifle competition. Greenwood on Public Policy, 654.

Any contract to prevent competition between rival railroads is void. *Railroad Co.* v. *Railroad Co.* 3 Robt. (N. Y.) 411 ; Const. art. 11, sec. 11 ; 1 Starr & Curtis, 163 ; Rev. Stat. chap. 114, sec. 222 ; 1 Starr & Curtis, 1915.

The sale of a controlling interest in the stock of a railroad company, to a rival railroad company, is void. *Railroad Co.* v. *Collins*, 40 Ga. 582.

Two railroad companies agreed to accept no freight for certain places, except to be carried on the road of the other, and this agreement was held void. 4 McCrary, 325.

The contract was void, because *ultra vires*. The charter of a corporation is the measure of its powers, and the enumeration of these powers implies the exclusion of all others. *Thomas* v. *Railroad Co.* 101 U. S. 82 ; *Railroad Co.* v. *Railroad Co.* 107 id. 100 ; *Davis* v. *Railroad Co.* 131 Mass. 258 ; *Attorney General* v. *Railway Co.* 5 App. Cases, 473 ; *Balsley* v. *Railroad Co.* 119 Ill. 68.

Mr. FRANCIS ADAMS, for the appellee :

The exercise, by appellant or appellee, of the powers granted by their respective charters, is permissive, and not mandatory or compulsory. *Gas Light Co.* v. *Brady*, 27 N. J. 245 ; *Gas Light Co.* v. *Gas Co.* 25 Conn. 19 ; *People* v. *Railroad Co.* 24 N. Y. 261 ; *Railway Co.* v. *Queen*, 72 Eng. C. L. 858 ; *Railway Co.* v. *Philip*, 2 McQueen, 514 ; *Railway Co.* v. *Stewart*, 3 id. 382 ; *King* v. *Canal Navigation*, 2 Black. 708.

A private corporation having received and appropriated the benefits accruing to it under its contract, can not escape liability on the ground that the contract was *ultra vires.* *Navigation Co.* v. *Weed,* 17 Barb. 378; *Bradley* v. *Ballard,* 55 Ill. 413; *Darst* v. *Gale,* 83 id. 186; *Thomas* v. *Railway Co.* 104 id. 462; *Millard* v. *Academy,* 8 Bradw. 321; *Brown* v. *Mortgage Co.* 110 Ill. 235.

The defendant ought not to retain the money borrowed, and escape its repayment on the plea that it had no right to borrow it.    See *DeGroff* v. *Linen Thread Co.* 24 Barb. 275; *Bissell* v. *Railroad Co.* 22 N. Y. 258; *Railroad Co.* v. *Dow,* 19 Fed. Rep. 388; Wood's Field on Law of Corp. sec. 233.

The contract is not contrary to public policy, as being in restraint of trade, or tending to prevent competition, or create a monopoly.    *Ferry Co.* v. *Railroad Co.* 73 Mo. 389; *Bowser* v. *Bliss,* 7 Blackf. 344; *Peltz* v. *Eichele,* 62 Mo. 171; *Dunlap* v. *Gregory,* 10 N. Y. 241; *Chappel* v. *Brockway,* 21 Wend. 157; *Warren* v. *Jones,* 51 Me. 146; *Craft* v. *McConoughy,* 79 Ill. 346.

Mr. C. BECKWITH, also for the appellee.

Mr. JUSTICE MAGRUDER delivered the opinion of the Court:

This is a bill for the specific performance of a contract, the nature of which will be explained hereafter.    Upon final hearing in the Superior Court of Cook county the preliminary injunction, which had been granted, was dissolved and the bill dismissed.    The bill was filed in that court by appellee against appellant.    The cause was heard upon the pleadings and exhibits thereto, and upon certain affidavits filed with the answer. The Appellate Court, to which an appeal was taken, reversed the decree of the Superior Court and remanded the case with directions to "enter a decree enjoining and restraining the said Chicago Gas Light and Coke Company from laying gas mains or pipes in the said West Division, or entering into contracts

for supplying the city or the inhabitants in said West Division with gas and from in any manner violating said contract." The case is brought before us by appeal from the Appellate Court.

The Chicago Gas Light and Coke Company was incorporated by an act of the legislature approved February 12, 1849, the second section of which is as follows:

"The corporation hereby created shall have full power and authority to manufacture and sell gas to be made from any and all of the substances, or a combination thereof, from which inflammable gas is usually obtained, and to be used for lighting the city of Chicago, or the streets thereof, and any buildings, manufactories, public places or houses therein contained, and erect all necessary works and apparatus, and to lay pipes for the conducting of the gas in any of the streets or avenues of said city: *Provided,* that no permanent injury or damage shall be done to any street, lane or highway in said city. The real estate which the corporation is entitled to hold shall not exceed in value $50,000."

Section 3 provides, among other things, that the capital stock of the corporation shall not exceed $300,000, and that "said company shall have the exclusive privilege of supplying the city of Chicago, and its inhabitants with gas for the purpose of affording light for ten years."

An amendment, approved January 17, 1855, authorized an increase of $1,000,000 to the capital stock of the company, and also authorized the company to borrow money for constructing, carrying on and completing its works under the direction of its board of directors, and to issue bonds and mortgage its property. The company was also authorized to acquire and hold real estate necessary for its business.

The second and only other amendment to the original charter, was approved March 12, 1869, and simply authorized an increase of the capital stock of the company "to an amount not to exceed $5,000,000."

The People's Gas Light and Coke Company (the appellee) was organized under a special charter, approved February 12, 1855.   The bill states the substance of the powers conferred and rights granted, as follows:   "With power and authority to erect the necessary works for the manufacture of gas and coke within the city of Chicago, and, on and after the 12th day of February, 1859, to manufacture and sell gas to be made from any and all substances, or a combination thereof, from which illuminating gas is usually obtained, and to be used for the purpose of lighting the city of Chicago, or the streets thereof, and any buildings, manufactories, public places or houses therein contained, and to erect all necessary works and apparatus for that purpose.   And on and after the 12th day of February, 1859, or sooner, and by and with the consent of the Chicago Gas Light and Coke Company, to lay pipes for the purpose of conducting the gas, in any of the streets or avenues of said city, with the consent of the city council."

The bill also states, that by an amendment to the said act of February 12, 1855, approved February 7, 1865, the People's company "was granted full power and authority forthwith to proceed to the erection and maintenance of the necessary works for the manufacture of gas and coke within the said city of Chicago, and to manufacture, supply and sell gas, to be made from any and all substances, or a combination thereof, from which illuminating gas is usually obtained, and to be used for the purpose of lighting the city of Chicago, any streets, buildings, manufactories, public places or houses therein contained, and to erect and use all necessary works and apparatus for such purposes aforesaid, and, with the consent of the common council of said city, to lay down and use all necessary pipes for the conducting of gas, in and along any of the streets, alleys, avenues or public squares of said city."

In 1858, an ordinance was passed by the common council of Chicago, authorizing the People's company "to lay its gas

mains, pipes, feeders and service pipes in any of the streets, alleys, avenues, highways, public parks and squares through said city, subject to then existing rights, and, at all times, to the resolutions and ordinances of the common council of said city."

On April 21, 1862, a contract was made between appellant, of the first part, appellee of the second part, and Cornelius K. Garrison of the third part, the material portions of which are as follows:

"*Third*—For and in consideration of the sale and convey-ance of the said improvements, by the said party of the first part, to the said party of the third part, as aforesaid, and of the covenants and agreements herein contained, to be kept and performed by the said parties of the first part, the said parties of the second and third parts, separately, each for themselves, hereby covenant and agree to and with the said party of the first part, that they, the said parties of the sec-ond and third parts, or either of them, will not, during the period of one hundred years from this date, either jointly or separately, in their own names or in the names of any other party or parties, lay, or cause to be laid, any gas mains or gas pipes, of any kind, in the North and South Divisions of the said city of Chicago, or in such parts of said city as now lie, or may hereafter lie, east of the north and south branches of the Chicago river, nor furnish nor sell illuminating gas to any person or persons, for consumption or use, within the said last mentioned portions of the said city of Chicago; nor, during the period aforesaid, interfere with or molest, in any way whatever, the business of the party of the first part of manu-facturing and selling illuminating gas, and its incidents, in the said last mentioned parts of said city of Chicago."

"*Fourth*—For and in consideration of the purchase and payment so made as aforesaid, by the said party of the third part, and of the covenants and agreements of the said parties of the second and third parts herein contained, the said party

of the first part hereby covenants and agrees to and with the said parties of the second and third parts, severally, that the said party of the first part will not, during a like period of one hundred years from the date hereof, either directly or indirectly, in its own name or in the name of any other party or parties, lay, or cause to be laid, any gas mains or gas pipes, of any kind, in the said West Division of the city of Chicago, or in such part or parts of said city as now lie, or may hereafter lie, west of the north and south branches of the Chicago river; nor furnish nor sell illuminating gas to any persons, for consumption or use, within the said last mentioned portions of said city of Chicago, nor, during the period aforesaid, interfere with nor molest, in any way whatever, the business of the said parties of the second and third parts, or either of them, of manufacturing and selling illuminating gas, and its incidents, in the said last mentioned part or division of said city."

This contract appears to have been observed by both parties until May or June, 1886, when appellant obtained permission from the city council to construct a tunnel under the south branch of the Chicago river, in which to lay gas mains to be connected with mains and service pipes in the streets of the West Division. The bill charges, that appellant threatens to lay its mains and service pipes in the West Division for the purpose of supplying gas there in violation of its contract. The object of the bill is to enforce the fourth clause of the contract as above quoted and prevent its violation.

Under its charter appellant had the right to make and sell gas to be used for lighting all the divisions of the city of Chicago and all of the streets and buildings therein. It had as much power and authority to lay pipes in the streets of the West Division as in those of the North and South Divisions. By the contract, it agreed to lay no mains or pipes in the West Division nor to furnish or sell any gas to persons living there for a period of one hundred years. It thereby bound

itself to avoid the performance of a duty which it owed to the public.

The manufacture and distribution of illuminating gas by means of pipes or conduits placed, under legislative authority, in the streets of a town or city, is a business of a public character; it is the exercise of a franchise belonging to the State; the services, rendered and to be rendered for such grant, are of a public nature. Where the right to make and sell gas to the city and its inhabitants, under the conditions here named, is conferred upon a company, it is so conferred as well for the benefit of the public as of the company.

In *New Orleans Gas Co.* v. *Louisiana Light Co.* 115 U. S. 650, the Supreme Court of the United States say:

"The manufacture of gas, and its distribution for public and private use, by means of pipes laid, under legislative authority, in the streets and ways of a city, is not an ordinary business in which every one may engage, but is a franchise belonging to the government, to be granted, for the accomplishment of public objects, to whomsoever, and upon what terms, it pleases. It is a business of a public nature, and meets a public necessity, for which the State may make provision. It is one which, so far from affecting the public injuriously, has become one of the most important agencies of civilization, for the promotion of the public convenience and the public safety."

In *Louisville Gas Co.* v. *Citizens' Gas Co.* 115 U. S. 683, the same court say:

"Such a business is not like that of an ordinary corporation engaged in the manufacture of articles that may be quite as indispensable to some persons as are gas lights. The former articles may be supplied by individual effort, and with their supply the government has no such concern that it can grant an exclusive right to engage in their manufacture and sale. But as the distribution of gas in thickly populated districts is, for the reasons stated in the other case, a matter of

which the public may assume control, services rendered in supplying it for public and private use, constitute, in our opinion, such public services as, under the constitution of Kentucky, authorized the legislature to grant to the defendant the exclusive privileges in question."

To the same effect are *Shepard* v. *Milwaukee Gas Light Co.* 6 Wis. 539; *City of St. Louis* v. *St. Louis Gas Light Co.* 70 Mo. 69; 2 Morawetz on Private Corp. sec. 1129; 2 Dillon on Corp. (3d ed.) sec. 691.

It is to be noted, that the appellant company was organized under a private charter granted before the adoption of the present constitution of the State, and that the power and authority therein conferred are not made subject, by the terms of the charter, to the consent of the city council.

Inasmuch, therefore, as by the terms of its charter the appellant owed a duty to the public, it could not avoid the performance of that duty by a contract with another corporation.

In *Peoria and Rock Island Railroad Co.* v. *Coal Valley Mining Co.* 68 Ill. 489, it was held: That the duties which railroad corporations owe to the public, and which are the considerations upon which their privileges are conferred, can not be avoided by neglect, refusal, or by agreement with other persons or corporations. Therefore, any contract to prevent the faithful discharge of any such duties will be against public policy, and void.

In *Hays* v. *Ottawa, Oswego and Fox River Valley Railroad Co.* 61 Ill. 422, this court says: "But a sale and transfer of the powers of one company to another, without the authority of the legislature, are against public policy, and the courts will do nothing which will promote the transfer, as it is in utter disregard of the duties and obligations of the company."

In *Thomas* v. *Railway Co.* 101 U. S. 83, it is said: "That where a corporation, like a railroad company, has granted to it by charter a franchise intended, in large measure, to be exercised for the public good, the due performance of those

functions being the consideration of the public grant, any contract which disables the corporation from performing those functions, which undertakes, without the consent of the State, to transfer to others the rights and powers conferred by the charter, and to relieve the grantees of the burden which it imposes, is a violation of the contract with the State, and is void, as against public policy."

In *City of St. Louis* v. *St. Louis Gas Light Co. supra,* the charter of the gas company gave it the "*exclusive*" right to manufacture and sell gas in the city of St. Louis. The company made a contract, by which it surrendered and abandoned its "*exclusive*" right to have gas works, lay pipes or furnish gas in a particular district of the city north of a certain line. It simply parted with the right, given it under its charter, to exclude all other companies from that district, but did not bind itself not to do a gas business there in common with other companies, if it saw fit to do so. The Supreme Court of Missouri there say:

"This right to exclude competition was not a right vested in the company for the benefit of the public, because, in its very nature, it was injurious to the public, but it was a right vested in the company for its own benefit, which it might, therefore, surrender, with the consent of its stockholders. The right to make and vend gas to the city and its inhabitants was a right conferred upon the company, for the benefit both of the company and the public, and not for the sole benefit of others, but the right to exclude competition was solely for the benefit of the company. If, in the provision of the contract above quoted, the company surrendered and abandoned a right to make and vend gas in that portion of the city described therein, then the position taken by counsel, that it abandoned a public duty, is maintainable. We do not think that said provision is susceptible of that construction, but, on the contrary, it is expressly declared that both of said companies, or any other company or individual, shall be per-

mitted to exist and do business in the aforesaid district or portion of said city without hindrance. We think it clear, that the St. Louis Gas Light Company did nothing more than surrender its right to exclude all competition in that part of the city lying north of Washington avenue, reserving to itself the right to meet any demand which might lawfully be made upon it by the public. There is no abandonment or surrender, on the part of the St. Louis Gas Light Company, of its right, or surrender or abandonment of its duty, to make and vend gas north of the south line of Washington avenue."

The appellant herein, the Chicago Gas Light and Coke Company, had the exclusive privilege under its charter of supplying the city of Chicago with gas for ten years from February 12, 1849, to February 12, 1859. So far as its privilege was exclusive, such privilege was for its own benefit and not for the benefit of the public. If, therefore, at any time before February 12, 1859, appellant had made an agreement with the appellee or any other company foregoing its exclusive right to make and sell gas in the West Division, such an agreement would have been valid as parting only with a privilege conferred for the benefit of the company. But the appellant binds itself, by the contract now under consideration, to surrender and abandon altogether for one hundred years all the right conferred upon it by its charter to manufacture and vend gas in the West Division. By so doing "it abandoned a public duty," and a court of equity will not aid either party in the enforcement of such a contract. 2 Morawetz on Private Corp. sec. 656; *West Virginia Transportation Co.* v. *Ohio River Pipe Line Co.* 22 W. Va. 617; *State* v. *Hartford and New Haven Railroad Co.* 29 Conn. 538; *Hartford and New Haven Railroad Co.* v. *New York and New Haven Railroad Co.* 3 Rob. 411; *St. Louis, Jacksonville and Chicago Railroad Co.* v. *Mathers*, 71 Ill. 592.

There may be cases where a corporation may abandon a public work for reasonable cause, but this is a very different

thing from disabling itself by contract from the performance of a duty to the public. Nor is the question here as to the extent to which duties imposed upon a corporation will be enforced by *mandamus;* the question is whether a court of equity will enforce the specific performance of such a disabling contract as is above indicated. In *Marsh* v. *Fairbury Co.* 64 Ill. 414, a bill in chancery was filed by Marsh for the specific performance of a contract which a railroad company had made with him "to locate passenger and freight depots of said road in Marsh's addition to Fairbury and at no other point in said town," and we there held that equity would not enforce the contract, because its enforcement was regarded as against public policy. This court said in that case: "The specific execution of a contract in equity is a matter not of absolute right in the party, but of sound discretion in the court; and in deciding whether specific performance should be enforced against a railway company, the court must have regard to the interests of the public."

Other provisions of the contract in the case at bar besides the third and fourth clauses above quoted show that appellant and appellee had already entered upon the discharge of their duties to the public, when the contract of April 21, 1862, was made between them. Appellee had laid mains and pipes east of the river and appellant had laid such mains and pipes west of the river. The contract provides for an exchange of these properties, and the proofs show that $40,000 were paid by appellee to appellant for the excess in value of the latter's interests on the West Side over the value of appellee's interests east of the river.

Moreover, the agreement of April 21, 1862, shows on its face, that, at that date, appellant had a contract with the city for lighting the street lamps, etc., on the West Side as well as in the other divisions of the city, and appellant thereby sold and assigned so much of such contract as applied to the West Side to the appellee, both parties covenanting each with the

other "to use such reasonable and proper influence as they respectively may have with the authorities of the city of Chicago, to procure a division of said contract; and a new and independent contract between said city and the said party of the second part for furnishing gas in the West Division."

In view of the provisions thus referred to, it is not necessary to discuss the question whether appellant's charter was permissive or compulsory, or whether it was or was not bound by the mere acceptance of its charter to enter upon the business of making and supplying gas. Inasmuch as it did actually enter upon such business in the West Division and commence supplying gas in that section to the city and the inhabitants there, a court of equity will not enforce the performance of a contract, by which it agreed to abandon the discharge of its duties to the public and not to resume the discharge of those duties for one hundred years.

The contract between these corporations tends to create and perpetuate a monopoly in the furnishing of gas to the city, and is, therefore, against public policy. They were organized under special charters at a time when the granting of such charters was not forbidden by the constitution of this State. Appellant, under its charter, had a monopoly of the business of supplying gas up to February 12, 1859. Four years before the latter date, to-wit: on February 12, 1855, the legislature granted to appellee its charter and therein clearly recognized appellant's monopoly, and indorsed its continuance for the balance of the ten years, but distinctly provided that, at the expiration of the ten years, appellee should have the same right to make and sell gas anywhere in the city as appellant had theretofore exclusively enjoyed, subject only to the consent of the common council.

We think it was clearly the intent of the legislature to put an end after February 12, 1859, to the monopoly which appellant had had prior to that time, and to give the gas business to two competing companies. The contract in question

sought to continue the monopoly in spite of legislative action. It invested the appellee with the exclusive right to furnish gas in the West Division and the appellant with such exclusive right in the North and South Divisions.

The ordinary rule, that contracts in partial restraint of trade are not invalid, does not apply to corporations like appellant and appellee, because they were engaged in a public business and in furnishing that which was a matter of public concern to all the inhabitants of the city. In *West Virginia Transportation Co.* v. *Ohio River Pipe Line Co. supra*, it was said: "If there be any sort of business, which from its peculiar character can be restrained to no extent whatever without prejudice to the public interest, then the courts would be compelled to hold void any contract imposing any restraint however partial on this peculiar business, provided of course it be shown clearly that the peculiar business thus attempted to be restrained is of such a character that any restraint upon it however partial must be regarded by the court as prejudicial to the public interest."

In the *West Virginia case* it was held that "whenever the legislature by statute law has authorized any person or corporation to condemn the lands of others in order to carry on its business, the courts will regard this as a legislative declaration that this character of business is such as that the public has so great and direct an interest in, that the courts must hold it as contrary to public policy to permit any restriction of it by private contract." If clothing a corporation with the power of eminent domain, that is, with the right to take an individual's property by paying him for it, so stamps the business of such corporation with a public character that that business may not be restricted by contract, we see no reason why the same public character should not attach to a corporation which is vested with the right and power to tear up and use the streets of a great city. The fee of such streets is vested in the city for the benefit of the public. Any business,

35—121 ILL.

which requires their use, requires the use of property which belongs to the public. *Western Union Telegraph Co.* v. *American Union Telegraph Co.* 65 Ga. 160.

It is claimed that the restraint imposed on each of these companies by the contract is only partial, because confined to a particular division of the city. In *Craft* v. *McConoughy*, 79 Ill. 346, we held that, even if the restraint imposed by the contract was but partial, yet if it was unreasonably oppressive and injurious to the public, it would not be sanctioned in a court of equity. It was there said: "Whatever is injurious to the interest of the public is void on the ground of public policy."

Neither appellant nor appellee had any power to make the contract now under discussion. By the amendment of February 7, 1865, appellee was authorized "to borrow money and to mortgage or lease any of its property or franchises." But in April, 1862, neither the charter of appellant nor that of appellee conferred any authority to sell, transfer, assign or make over to any other company any of the powers or franchises therein granted. By this contract appellant virtually assigns, surrenders and transfers all its right under its charter to make and sell gas in the West Division to the appellee, and the appellee so disposes of all its rights in the South and North Divisions to appellant. The authority to assign and transfer the privilege of making and selling gas is not incident to nor necessarily implied from the power of making and selling gas.

"The powers of corporations organized under legislative statutes are such and such only as those statutes confer. Conceding the rule applicable to all statutes that what is fairly implied is as much granted as what is expressed, it remains that the charter of a corporation is the measure of its powers and that the enumeration of these powers implies the exclusion of all others." (*Thomas* v. *Railroad Co.* 101 U. S. 71.) "Corporations have such powers and such only as

the act creating them confers, and are confined to the exercise of those expressly granted and such incidental powers as are necessary to carry into effect those specifically conferred." (*Franklin Bank* v. *Commercial Bank*, 36 Ohio St. 355; *Balsley* v. *St. Louis, Alton and Terre Haute Railroad Co.* 119 Ill. 68.) Hence the contract here sought to be enforced was *ultra vires* of both appellant and appellee.

For the reasons here stated the judgment of the Appellate Court is reversed.

*Judgment reversed.*