THE BOROUGH OF EAST NEWARK ·

*v.*

THE NEW YORK AND NEW JERSEY WATER SUPPLY
COMPANY et al.

[Filed May 25th,. 1904.]

On an interpleader bill it appeared that the city of Jersey City had made a contract, while it had a water-supply of its own, to supply another municipality—the borough of East Newark—with water for public and domestic purposes. Its own supply became unfit for use and so it contracted with the East Jersey Water Company for another supply, but for its own needs only. The East Jersey company furnished this supply, and also furnished a supply to the borough. The supply to the borough ran for a short distance through a pipe belonging to Jersey City. The East Jersey company charged Jersey City at the rate of $35 per million gallons, not only for so much water as Jersey City and its inhabitants consumed, but also for the water furnished the borough. Jersey City charged the borough at the rate of $90 per million gallons for the water it received. Although the contract between the borough and Jersey City expired in July, 1902, the arrangement was allowed to continue, without contract, until July, 1903, when the assignees of the East Jersey company notified the borough that it must pay the price of the water ($90) to them.— *Held,* that Jersey City, having neither the power to make a contract to supply another municipality with water not its own, nor an express contract which purported to do so, nor water of its own to furnish, could not recover the price of the water furnished to the borough. *Held further,* that although neither the East Jersey company nor its assignees had any express contract with the borough to furnish it with water, yet inasmuch as that company had actually supplied the water, and inasmuch as the borough had, in its interpleader bill, admitted its receipt and its liability to pay for it, the price of the water should be adjudged to belong to the company or its assignees. *Held further,* that out of the moneys brought into court, Jersey City was entitled to compensation for the use of its pipe.

*Mr. George L. Record* and *Mr. Robert Carey,* for Jersey City.

*Mr. Herbert Boggs* and *Mr. Gilbert Collins,* for the New York and New Jersey Water Supply Company and New Jersey Suburban Company.

STEVENS, V. C.

This is an interpleader suit. The borough of East Newark brings into court the sum of $2,603.81, which it admits that it owes for water supplied to it between July 8th, 1903, and October 8th, 1903. The bill alleges that it is uncertain whether it owes the money to the city of Jersey City or to the New York and New Jersey Water Supply Company and the New Jersey Suburban Company, the two latter claiming jointly under an assignment from the East Jersey Water Company. Jersey City and these two companies, whom I will hereafter designate as such, have filed cross-bills, on a decree of interpleader, and the question is which has the better right to the money paid into court.

The facts are somewhat complicated and will have to be stated at length. In the year 1885 Jersey City took its water-supply from the Passaic river, at Belleville. It was pumped from the Passaic into a reservoir near the junction of Belleville turnpike and Kearny avenue, and from thence it flowed through pipes across the meadows to Jersey City Heights. In that year it made a contract with the town of Harrison to supply that town with water. To enable it to do so it was obliged to construct a twenty-inch main from one of its own mains in the Belleville turnpike through Kearny avenue, in Kearny township, that township lying between the turnpike and the town of Harrison.

In 1887 Jersey City made a contract with Kearny township to supply it with water for the term of ten years, at $90 per million gallons. This water was also supplied through the twenty-inch main. The contract, by its terms, expired July 12th, 1897. Prior to the expiration of this contract, and some time in July, 1895, the borough of East Newark was set off from Kearny township and became a separate municipality, but the inhabitants of the borough continued to receive, and Kearny township continued to collect for water as before, until March, 1897, when Kearny township notified the borough that the water supplied through its pipes to the borough would be discontinued after July 1st.

On July 1st, 1897, the borough made a contract with Jersey City for a water-supply, for five years, at $90 per million gallons. This contract, by its terms, expired July 1st, 1902. No other express contract between Jersey City and the borough was made until December 9th, 1903. This latter contract does not touch the present inquiry, because made after the water in suit was furnished.

If the foregoing were the only pertinent facts, of course the money in court would belong to Jersey City. But there are other facts. Prior to the year 1895, the water taken from the Passaic at Belleville had become greatly polluted, and Jersey City began to look about for a new supply. The East Jersey Water Company had, prior to 1895, furnished a water-supply to the city of Newark, drawn from the Pequannock. By its contract with that city it was at liberty, for a certain time, to utilize the surplus water not required by Newark for its own inhabitants. So, in October, 1895, it made a contract with Jersey City for a temporary supply, to be delivered into the Jersey City mains near the junction of Belleville turnpike and Kearny avenue. The contract was to run for one year from the time when the East Jersey company should begin to deliver it, but it was stipulated that inasmuch as the company would have a surplus of Pequannock water to dispose of until September 24th, 1900, if Jersey City should not terminate the contract at the end of the year, its terms and conditions should continue in force up to September 24th, 1900, unless the city should terminate it by giving three months' notice in writing. Under this agreement Jersey City at first received only a partial supply of water from the East Jersey company. For the residue it utilized, as before, its own works at Belleville. In the spring of 1898, however, the company commenced to make a full delivery. The East Jersey company was able to give this supply through its works at Little Falls. It had by a supplemental agreement, dated April 2d, 1897, undertaken to furnish from the Passaic river, above the Great falls thereof, as much water as was needed to supplement the Pequannock supply. This agreement provided that the water company might, on two years' notice,

terminate the contract, and the company did, in October, 1900, give a notice that it would so terminate it on October 23d, 1902. Before this date, however, to wit, on March 31st, 1902, it made another contract with Jersey City to continue the supply until the Flynn contract was completed. This was a contract which Jersey City had made for the purpose of securing a permanent supply of water, to be drawn from the Rockaway river at or near Boonton. In June, 1903, work under this contract had progressed so far that the East Jersey company was able to connect its main with the new mains running through Kingsland at Upper Montclair, and thereafter the water was supplied to Jersey City through those mains. The old mains in Belleville turnpike running to Jersey City were abandoned. The water supplied by the East Jersey company to East Newark and Kearny continued to be supplied as before.

I lay out of view a contract which I have not as yet referred to—a contract, namely, between the East Jersey company and Kearny. The contract was made June 29th, 1895. It provided for a supply of water at the price of $90 per million gallons for fifteen years, commencing six months after its date. It did not go into effect, probably, because there was no main into which the company's water could be delivered except the main owned by Jersey City. The time for the delivery of the water under this contract with Kearny was twice extended, the first time by supplemental contract, dated February 14th, 1896, and the second time by supplemental contract, dated June 14th, 1898. But neither the original contract nor its two extensions was or is binding upon the borough of East Newark. It is well settled that when a borough is set off from a township the borough is not liable to a creditor of the township for previously contracted obligations. *Lodi* v. *Hackensack Improvement Commission, 60 N. J. Eq. (15 Dick.)* 229. The contract was in fact entered into only a few days before the separation of the two municipalities. Nothing was done, or attempted to be done, under it until July, 1903, and none of the parties to this controversy had up to that time treated it as in any way binding upon the borough. It may therefore be laid out of the case.

At the time the third contract with Jersey City was made (March, 1902) the situation was this: Jersey City was getting all the water that it needed for itself from the East Jersey Water Company at the rate of $35 per million gallons. This water was then being delivered by that company into the Jersey City mains at Belleville. At the same time the East Jersey company was delivering water through a pipe of its own into the Kearny avenue main which belonged to Jersey City, for the use of Kearny township, the borough of East Newark and the town of Harrison. This water was charged to Jersey City by the water company at the same rate ($35) and Jersey City charged the three municipalities $90 per million gallons for it. This, as I said on a former occasion, appears to have been the result of a *modus vivendi,* brought about by the ownership by Jersey City of the main in Kearny avenue.

We come now to the questions at issue. They are the following: (1) Has Jersey City any legal right to sue East Newark for the water used by it? (2) Have the two companies any such right? (3) What are the equitable rights of the parties to the money paid into court?

(1) It seems to me plain, in the first place, that Jersey City has no legal right to the fund in court. In July, 1902, the time of the expiration of the written contract with East Newark, Jersey City had neither the water to supply nor the power to enter into an agreement to supply it. It had, confessedly, no water of its own. Its original source of supply had been abandoned as unfit for use. Its new source of supply, the Rockaway river at Boonton, had not yet become available. The East Jersey company was furnishing all the water. And it did not at that time have the power to enter into a contract with the East Jersey company to provide it with water for the use of East Newark. It is quite possible, although the question is not before me for decision, that if Jersey City had entered into a valid contract with an adjoining municipality at a time when it could have contracted, and if its own supply had temporarily failed, it could, for the performing of that contract, have contracted for a temporary supply. But that is not this case. The question here is

whether it could contract with a water company not only for water for its own needs but also for water to be supplied to a municipality to which it was then under no contract obligation. I have not been referred by counsel to any legislation which vests a municipality with any such power—a power, as counsel for East Newark puts it, "to buy and sell water as a commodity." If a municipality has a water-supply of its own, and this supply is more than sufficient for its needs, there is a very good reason for investing it with the power to sell this water to neighboring municipalities. Both are obviously benefited. The statutes referred to (*P. L. of 1885; Gen. Stat. p. 655 § 940; P..L. of 1884; Gen. Stat. p. 2206 §§ 385, 389*) do this, and the charter of Jersey City (*P. L. of 1871 p. 1094 § 76*) further authorizes it to distribute water "through such portions of the counties of Hudson and Bergen as the inhabitants may desire;" in other words, to furnish water to individuals outside of the corporate limits. None of these statutes goes further.

Not only did Jersey City not have the right to contract with a water company for water in excess of its own needs, but the borough of East Newark had no right to enter into a contract for water with Jersey City. The Borough act of 1897 (*P. L. of 1897 p. 323 § 76*) only authorizes water contracts to be made with adjoining municipalities. It is admitted that the territory of the borough does not adjoin or touch Jersey City.

But there is this further pertinent fact. Jersey City, in its various contracts with the East Jersey company, did not attempt to contract for a supply of water which it might sell to other municipalities. The language of the contracts on this head is so clear that a discussion of their provisions would be superfluous.

It is an admitted fact that when the written contract made by Jersey City with East Newark, in 1897, which ran for five years, expired on July 1st, 1902, no other written contract was made.

The contention of Jersey City is this: Although Jersey City has no express contract with East Newark, yet she has an implied one, running from year to year, which could only be terminated on one year's notice. In support of this contention

the case of *Taylor* v. *Lambertville, 43 N. J. Eq. (16 Stew.) 107,* is relied on. I should doubt whether the authorities cited support the conclusion reached in that case; but, if sound, it is clearly distinguishable. There the municipality had the power to contract for gas, and the gas company was able and willing to supply it on the old terms. In the case at bar, a valid contract could not have been made, and Jersey City did not, at the time, have water of her own to furnish. The case comes within the authority of *Hackettstown* v. *Swackhamer, 37 N. J. Law (8 Vr.) 191.* In that case the treasurer of the town had given a note for money borrowed. Suit was brought upon the note, and the question was, in the words of the chief-justice, "whether a municipal corporation, in the absence of an express power for that purpose, can contract for loans for the supply of its ordinary expenses." The question was answered in the negative, and it was decided that an action would lie neither upon the note nor upon an implied *assumpsit* based upon the fact that the municipality had had the benefit of the money. The principle of that case applies here, there being no power to enter into an express contract, and it being impossible to imply one. In the first place, although the contract between the East Jersey company and Jersey City expressly provided for water sufficient only for the needs of Jersey City, we would, contrary to the ordinary presumption which obtains in the case of a contract reduced to writing, have to imply a contract between the East Jersey company and Jersey City for an additional supply, to be furnished for the use of East Newark. Under such a contract, if binding, Jersey City would be legally liable to pay the contract price and, if necessary, to raise money by taxation to enable it to pay, if East Newark did not pay. In the *Hackettstown Case* the court was asked to imply a promise where the town itself got the benefit. In this case the court is asked to go a step further and imply a promise where another municipality got the benefit.

But there is another difficulty. The contention is, not that the court should imply a contract agreeable to the tacit consent of the parties, which continued all the time that the benefit was

being conferred, but that it should imply it in spite of the dissent of the company which actually furnished the water. The situation was this: The East Jersey company brought its own water in its own pipes to the main in Kearny avenue. This water flowed through the Kearny main to East Newark, where it was delivered to the inhabitants of that borough. This was, on its face, a delivery by the East Jersey company of its own water, and none the less so, because rightfully or wrongfully, with or without consent, a main that had been laid by Jersey City in Kearny avenue was used in its transmission. It is evident that if the title to the water was, in legal contemplation, during the course of its transmission, changed, it could only have been changed as the result of a contract. But no express contract was made, and to imply a contract which the parties were not legally authorized to enter into is impossible.

What happened in this case was that the East Jersey company rendered a bill for the water at the rate of $35 per million gallons, and that Jersey City paid it, and that Jersey City rendered a bill for the water to East Newark at the rate of $90 per million gallons, which East Newark also paid, the East Jersey company, for reasons of its own, not objecting. In view of this situation can we deduce a contract for a future supply which the parties could not terminate except on notice? The question answers itself. It is perfectly evident that there was no contract between the parties, legal or illegal. The arrangement was a mere *modus vivendi.* As it rested on no contractual obligation it continued no longer than the parties saw fit to continue it. When the East Jersey company said, we will no longer render to you bills for the water which we are furnishing to East Newark, that ended the matter, so far as Jersey City was concerned. They had no legal ground for insisting that the arrangement should continue.

(2) But in the second place, what legal right have the two companies to sue at law for the money? It is admitted that neither they nor the East Jersey company have any written contract with the borough. In the case of *New Jersey Car Spring and Rubber Co.* v. *Jersey City, 64 N. J. Law (35 Vr.)*

*544,* it appeared that Jersey City had the power to contract for the goods furnished, for whose price the suit was brought. These goods were actually used in one of the departments of the city government, but they had not been ordered by the appropriate board, nor was it shown that they "had known of the requisition and the subsequent acceptance and use of the goods." It was held that only in so far as that board had by resolution ratified their purchase could their price be recovered.

In this case, looking at the agreed statement of fact, which is not so full as it might have been on this branch of the matter, in connection with the bill of interpleader, it appears, with reasonable certainty, that the borough itself received the water. Where water supplied by a water company is used by the inhabitants of a town it is the inhabitants receiving it who are primarily liable to pay for it. It is only by a statute that a town becomes liable to pay for water used by individuals. The Borough act before referred to authorizes boroughs to make contracts for a supply of water not only for public but also for domestic purposes, the legislative scheme being that all the water shall be purchased by the borough itself and by it sold to its several inhabitants. The case agreed upon states that the borough has a system of distributing pipes and a schedule of water rates for water metered to consumers. The bill of interpleader states that in the year 1898 the borough entered into a contract with the mayor and aldermen of Jersey City for a supply of water for the necessities of its inhabitants for the term of five years, and that during said term, and up to the present time, so far as it has any knowledge, it has received, and is now receiving, such supply from said mayor and aldermen. This, I think, is an admission that all the water received has been received by the borough as such. It then goes on to state that it has been notified that the water which it is receiving belongs to the two companies, and if the borough uses it the two companies expect the borough to pay them for it; that it has been sued by those companies; that it is unable to determine to whom of right the price of the water belongs; and

18

that it has been and is ready and willing to pay the money to such person as shall be lawfully entitled to receive it.

It seems to me that this explicit admission of the receipt of the water by the borough, and of its liability and willingness to pay for it, brings the case within the reason of the rule laid down in *New Jersey Car Spring and Rubber Co.* v. *Jersey City, supra,* and *Cory* v. *Freeholders, 44 N. J. Law (15 Vr.) 445.* The gist of a ratification is the deliberate admission by the proper authority of a liability to pay for that for which it may lawfully contract. If the borough says I will pay A or B, to one or the other of whom I admit I am liable, as the court may adjudge, this is as much a ratification—a formal acknowledgment of a liability to pay—as if it had said I promise to pay A, or I promise to pay B.

Now, the proof is that the East Jersey company (or the two companies, its assigns) supplied the water; that the borough received it in the expectation of paying for it; and that by coming into court with the money it has solemnly admitted that it owes it to that one of the parties to which the court shall adjudge that it belongs.

(3) But there is another question. Looking at the transaction as it really is, it is this: The water belonged to the East Jersey company. That company transmitted it for a long distance through its own pipes and for a short distance through a pipe belonging to Jersey City. It should, therefore, be paid the price of the water furnished. But it used the pipe of Jersey City as the only possible means of delivery, and Jersey City has for years exacted a part of the whole price received for this use. It has never given up its claim. Jersey City could, no doubt, in some form of proceeding, have asserted its right to compensation for the use of its pipe, or to an injunction restraining its use, either absolutely or except on equitable terms. Hence it would seem equitable that Jersey City should have a part of the money.

I think there is considerable doubt on the agreement of July 1st, 1903, made between the two companies and the East Jersey company, whether anything was thereby assigned except the East

Jersey company's rights under the Kearny contract. It would seem from one of the exhibits—the water bill of January 7th, 1904—that the East Jersey company may have intended to assign its right as against the borough to the two companies, but the bill refers to the contract of July 1st, which affords but a doubtful title. In accordance with my suggestion that company has been made a party. If the East Jersey company concedes the right of the two companies to the money, there will now be no difficulty in paying it out.

If the parties cannot agree upon the compensation to be paid to Jersey City, a reference should be ordered.